UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHAD MAERTZ,

    Petitioner,

v.                                          Case No. 07-C-811

GREG GRAMS,

    Respondent.

**DECISION AND ORDER**

Chad Maertz was convicted in Fond du Lac County Circuit Court of attempted abduction of a sixteen-year-old girl. After exhausting his state appeals, he filed a motion for federal habeas relief under 28 U.S.C. § 2254. In a previous decision and order, this court dismissed two of Maertz's three claims as being unexhausted. The final claim is now fully briefed. For the reasons given herein, the petition will be denied and the case dismissed.

**I. BACKGROUND**

While Maertz was driving his truck in Fond du Lac County, he stopped a sixteen-year-old girl who was riding her bike home from Campbellsport High School. At trial, he claimed he was merely reprimanding the girl for her erratic bicycle riding, but the jury concluded he had attempted to abduct her by force.

Maertz's present challenge involves the pretrial publicity that his case received in the local community. He suggests that over the years Fond du Lac County has had a disproportionate number

of child abductions, and this unfortunate history caused the local media to view the Maertz trial in that context and to cover the story intensely.[1] In fact, between August 13, 2002 (the day after the attempted abduction) and September 22, the local newspaper published no fewer than twelve front-page stories about the incident. One story was headlined, "You Can Run, But You Can't Hide" – a quote from a county sheriff's deputy referring to the then-unapprehended suspect. (Spiering Aff., Ex. B.) That story and others referenced the officials' conclusion that the girl was telling the truth and that the would-be abductor was a dangerous threat to the community.

When Maertz was arrested several days later, the newspaper referred to the fact that he was a registered sex offender. Other stories highlighted the discrepancy between the story he was telling police and the story told by the victim. A photo of Maertz in his jail uniform was shown in the newspaper on several occasions, and every article mentioned the fact that he was a registered sex offender.

Maertz moved for a change of venue – either to move the trial itself or to import jurors from other counties. The trial court denied the motion. First, the court found that the newspaper articles were not inflammatory but rather were standard crime articles (many of which were written before Maertz was a known suspect) describing the allegations and police efforts to get the word out that there was zero tolerance for such behavior. (Spiering Aff., Ex. K at 54-55.) The court further found that any potential for juror bias could be weeded out through *voir dire* because circulation of the

---

[1] It is not at all clear that Fond du Lac County's experience with child abductions is much different than other counties its size. Maertz refers to the murder of a child in 1973, the disappearance of a boy in 1983, to child abductions in the 1990s and the sexual assault of a girl in 2001. Five such incidents over thirty years may be high, but Meartz offers no data for other similar counties.

2

Case 2:07-cv-00811-WCG   Filed 01/30/09   Page 2 of 11   Document 32

local newspaper was not great. Combined with the time lapse (several months) and the relatively low level of inflammatory character in the news articles, the judge believed there was little risk of seating a biased jury.

The trial court conducted an extensive *voir dire* of the 28 potential jurors. Of those, 18 said they were at least somewhat familiar with the case, and 6 of these individuals ended up on the jury that heard the case. Maertz highlights the *voir dire* of juror Beverly Bechler in particular:

> MR. HARTLEY [Defendant's counsel]: Based upon what you have read, have you formed any opinions about this case at all, any opinions whatsoever?
>
> BEVERLY BECHLER: I guess it kind of changes as I read the articles. A definite opinion, no.
>
> MR. HARTLEY: Do you have any opinion – specific opinion that you might be able to share with us that you have? Do you have any based upon what you have read, any inklings or hunches about anything?
>
> BEVERLY BECHLER: Well, I guess, like, say, when I first read the girl's account, I'm like, well, you know, he – this could go either way. It could be that her version is true. It could be his version is true and that she was just looking at it a different way.
>
> MR. HARTLEY: You are aware that – You remember two versions?
>
> BEVERLY BECHLER: Uh-huh.
>
> MR. HARTLEY: And that was in the beginning of the case. Is your opinion about whether it could be either way, has that changed at all?
>
> BEVERLY BECHLER: Well, I guess when I read that there was two other involvements previous years, then I – then I tended a little more towards, well, maybe her version was more true, but not having a real definite opinion, just kind of going back and forth on it.

(Spiering Aff., Ex. L at 123-24.)

The jury convicted Maertz on one count of attempted child abduction, but the jury deadlocked on counts of attempted kidnapping and attempted false imprisonment. The trial court denied postconviction relief and, after granting a reinstatement of Maertz's direct appeal rights, the court of appeals affirmed.

**II. ANALYSIS**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs review of Maertz's petition. Under that statute, a federal court can grant habeas relief only if the state court's decision: (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

> [A] state court decision involves an unreasonable application of clearly established law if the state court identifies the correct rule and unreasonably applies it to the facts, or if the state court unreasonably extends, or refuses to extend, a rule of law. In determining whether Supreme Court precedent has been applied unreasonably, we do not ask simply whether the state court's application was erroneous, or even clearly erroneous, but whether the decision was "objectively unreasonable." *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003).

*Williams v. Bartow,* 481 F.3d 492, 498 (7th Cir. 2007).

Maertz argues that the Wisconsin courts misapplied *Sheppard v. Maxwell,* 384 U.S. 333 (1966) in allowing Maertz to be tried in Fond du Lac. *Sheppard* involved what the Supreme Court described as the "trial judge's failure to protect Sheppard sufficiently from the massive, pervasive and prejudicial publicity that attended his prosecution." *Id.* at 335. In that case, a high-society murder of a pregnant woman in a Cleveland suburb, newspaper accounts described the defendant, the woman's husband, as a "Lothario" with multiple lovers, repeatedly called into question the defendant's own accounts, editorialized about the need for an inquest, and chided the defendant for

4

refusing a lie-detector test and hiding behind a protective ring of family and attorneys. *Id.* at 338-40. One article even stated that he was "now proved under oath to be a liar . . ." *Id.* at 341. The volume of the coverage – both before and during the trial – was so great that the Court was unable to discuss all of it:

> There are five volumes filled with similar clippings from each of the three Cleveland newspapers covering the period from the murder until Sheppard's conviction in December 1954. The record includes no excerpts from newscasts on radio and television but since space was reserved in the courtroom for these media we assume that their coverage was equally large.

*Id.* at 342.

On top of all that coverage, the identities of each of the 75 prospective jurors were published in the newspaper, and these individuals received anonymous phone calls and other communications from people about the prosecution. In addition, both the prosecutor and the trial judge were in the midst of an election campaign. During the trial, the entire area (including the courtroom itself) was dominated by the presence of the press. Witnesses and jurors were photographed and televised coming and going. On the first day of trial, the news media rented a helicopter to film the jurors' viewing of the scene of the crime. "The fact is that bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." *Id.* at 355. Given the level of public interest in the story, "every juror, except one, testified at *voir dire* to reading about the case in the Cleveland papers or to having heard broadcasts about it." *Id.* at 346.

As noted earlier, the trial court in this case denied the motion to change venue. It concluded that the newspaper accounts were not particularly inflammatory, and found that *voir dire* would

5

solve any possible prejudice issues. The court of appeals affirmed. Its discussion of the issue follows:

> We agree that for the most part the articles imparted factual renditions of the offense, the investigation, Maertz's arrest, and his prior record. It was all information that jury would otherwise hear. However, it cannot be ignored that some of the coverage was designed to incite fear in the community about this type of crime and potential ramifications. Moreover, that coverage was exacerbated by investigator's comments feeding directly into the press coverage. The bulk of the publicity occurred four months before trial. The trial court found that the newspaper was not widely read with a subscription level under 30,000 in a county of 90,000 people. The trial court determined that there would be little difficulty in picking a jury. That proved to be the case when only nineteen of the thirty-one jurors questioned had been exposed to pretrial publicity.
>
> We consider it key that the trial court was cautious with jury selection and carefully explored the potential prejudice of any prospective juror that indicated having read pretrial articles. Seven prospective jurors were struck for cause, four because of their exposure to pretrial publicity. The six jurors who had read pretrial articles and remained on the panel assured the court that they could remain fair and impartial. Although Maertz now claims that he utilized his preemptory [sic] strikes to remove only jurors who had read pretrial articles, he never presented a challenge for cause or renewed his motion for a change of venue during or after jury selection.

(Answ., Ex. C, ¶¶ 19-20.)

Maertz raises several arguments about the pre-trial publicity and the state courts' conclusions about it. First, he asserts that the newspaper stories were inflammatory because they repeatedly informed readers that Maertz was a registered sex offender. Moreover, the stories almost universally sided with the sheriff's department's and parroted the victim's version of events. As to the first point, Maertz does not explain how the pre-trial reports of his sex offender status could prejudice the jury when the jury actually heard about his previous sex offenses during his trial. At trial, a stipulation was entered into evidence describing prior offenses involving the abduction of a six-year-old and sexual assault of an eleven-year-old. The newspaper articles printed several

6

months earlier merely stated facts that the jury was told in open court. Accordingly, the fact that the stories mentioned his sex offender status cannot have materially prejudiced the jury against him.

As to the tenor of the stories – their alleged "slant" in favor of the victim's version of events and their suggestion that children in the community might not be safe – the court of appeals conceded that at least a few of the stories may have crossed the line in inciting the community to fear child abductions. Even so, these stories were not out of the ordinary when a crime is committed in a small community. More to the point, they were a far cry from the "carnival atmosphere" described in *Sheppard:*

> Murder and mystery, society, sex and suspense were combined in this case in such a manner as to intrigue and captivate the public fancy to a degree perhaps unparalleled in recent annals. Throughout the preindictment investigation, the subsequent legal skirmishes and the nine-week trial, circulation-conscious editors catered to the insatiable interest of the American public in the bizarre. . . . In this atmosphere of a 'Roman holiday' for the news media, Sam Sheppard stood trial for his life.

384 U.S. at 356 (quoting 165 Ohio St. 293, 294, 135 N.E.2d 340, 342 (1956)).

Moreover, unlike *Sheppard,* there is not much difference between what the media accounts revealed and what the jury actually heard in open court. In *Sheppard,* the Court was concerned about countless bits of prejudicial information leaking into the jurors' consciousness from outside sources:

> Much of the material printed or broadcast during the trial was never heard from the witness stand, such as the charges that Sheppard had purposely impeded the murder investigation and must be guilty since he had hired a prominent criminal lawyer; that Sheppard was a perjurer; that he had sexual relations with numerous women; that his slain wife had characterized him as a 'Jekyll-Hyde'; that he was 'a bare-faced liar' because of his testimony as to police treatment; and finally, that a woman convict claimed Sheppard to be the father of her illegitimate child.

7

*Id.* at 356-56. Here, in contrast, the news accounts merely revealed information that the jurors were told during the trial, such as the fact of Maertz's prior convictions, his arrest, etc. And if the news stories had echoed the views of the sheriff's department, the jurors obviously heard the same story from the prosecution witnesses who testified. The fact that press accounts three months earlier may have echoed the "official" view of the case is of relatively little moment.

But even if the newspaper stories exceeded what was necessary to inform the public about the investigation and arrest, the last such story appeared on September 22, nearly three full months before Maertz's trial began. Newspaper reporters and editors would be giddy if the reading public had such a sharp memory for their stories, but obviously readers' memories fade with time. The passage of time is, in fact, a means of reducing potential prejudice sanctioned by the Supreme Court. *Sheppard,* 384 U.S. at 363 ("where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates . . .") Again, the stark contrast with *Sheppard* jumps off the page: in that case, the amount of press coverage (print, radio and TV) overwhelmed the Court's ability even to describe it in any detail. Here, we have a mere twelve stories in the local newspaper that were printed several months before the trial.

In addition, fully half of the jurors had no contact at all with the newspaper accounts at all, and, as the state courts noted, the crime was not particularly heinous or gruesome – it was an *attempted* abduction, after all. The girl was not harmed. It was not, in other words, the sort of crime that would inflame passions or evoke concerns for prejudice. Moreover, we are not discussing the chance for prejudice solely in the abstract – we have evidence that the jury was *not* biased. As the state courts aptly noted, the jury failed to convict on two of the three counts. One would think a jury motivated by bias would have had little trouble convicting on all three.

8

I conclude the state courts did not misapply any controlling Supreme Court precedent.[2] Ultimately, when a jury is informed about a defendant's prior criminal convictions for child abduction and sexual assault, it is difficult to argue that a few stale newspaper accounts could have any deleterious impact on the jury's ability to be impartial. In other words, any real chance for prejudice from newspaper accounts was dwarfed by the information, presented *during* the trial, about Maertz's own previous criminal behavior. In sum, the nature of the newspaper articles was not particularly inflammatory and any potential for unfair prejudice was dissipated by the length of time that had passed. The state courts did not contravene any clearly established federal law in reaching that conclusion.

Maertz also suggests that the *voir dire* reveals that the jury pool was tainted. Yet the trial court conducted a thorough *in camera* review of the jurors' exposure to the pretrial publicity, and Maertz was able to use peremptory challenges to exclude many of them. He cites the *voir dire* of juror Beverly Bechler (quoted above) as being emblematic of juror bias, but at worst she admitted what any honest respondent would have to concede in that situation: that, if asked to pick between the conflicting stories of two strangers, one of whom was a sex offender, she might "tend[] a little more towards, well, maybe [the girl's] version was more true . . ." (Spiering Aff., Ex. L at 124.) Maertz highlights this line as evidence that Bechler was leaning towards the victim's version of the story and thus was biased. But in the next breath Bechler reiterated that she did not have "a real definite opinion, [she was] just kind of going back and forth on it." (*Id.*) More importantly, in

---

[2]The state court of appeals did not squarely address the question as a matter of federal constitutional law, but its analysis echoed the concerns set forth in *Sheppard* (which the trial judge cited) and other cases.

9

portions of the transcript not cited by Maertz, the trial judge quizzed Bechler at some length about her ability to be fair.

> THE COURT: Many times the evidence in a trial mirrors or matches what you have heard in the media. Sometimes what you have in the media isn't all the facts, and sometimes they plain flat out have the facts wrong. Ultimately, your duty as a juror is to decide what the facts are only on evidence that is proven in the courtroom, so you will be asked to put in a box on the shelf, not consider, not go back and think about what the newspaper might have said, but only decide the case on what's proven in the courtroom. Can you do that?
>
> BEVERLY BECHLER: I believe so.

(*Id.* at 120.) She was later asked by counsel if she had any doubts about whether she could be fair. "I don't think so," she said. "Because . . . you can't always believe . . . what you read . . . is correct." (*Id.* at 125.) Apparently satisfied with the response, Maertz's attorney did not even move to strike Bechler for cause.

As already noted, the fact that Maertz was a sex offender was made known to the jury during the trial, and so the newspaper stories several months earlier cannot be blamed for that. Bechler's response to counsel's inquiry as to what she was inclined to believe based solely on the media coverage reveals her to be about as open-minded as any rational reader of the newspaper in such circumstances can be expected to be. In nearly every important criminal case, those reading stories about the accused, if asked, are likely to believe the media account of a crime before they hear any evidence. The question, however, is not what impressions a prospective juror might gain from media coverage of an incident; the crucial question is whether the prospective juror can put the media accounts aside and decide the case on only the evidence received at trial. Bechler, like the rest of the jurors, stated she could, and there is no reason to believe she did not do so.

10

Jurors are not required to be recluses who never read the newspaper or watch the television news. If that was the law, no one who took an interest in his or her community could serve as a juror on any case that the media covered. To be fair and impartial, a prospective juror must simply be willing and able to put aside any such information they may have received from the media and decide the case only on the evidence received at trial. Maertz has pointed to nothing in the record suggesting that the jury that convicted him did not do so. Accordingly, I do not find that the *voir dire* reveals the jury to have been biased against the defendant.

For the reasons given above, the petition is denied and the case **DISMISSED**.

**SO ORDERED** this   30th   day of January, 2009.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge